## OCE JONES v. STATE.

No. A-1717.   Opinion Filed November 1, 1913.

(136 Pac. 182.)

Rehearing Opinion December 20, 1913.

(137 Pac. 121.)

1.   APPEAL—Review — Verdict — Conflicting Evidence.   Under the law in this state issues of fact arising in the trial of a criminal action are for the jury, and when there is a clear conflict in the testimony their finding thereon will not be disturbed by this court.

2.   STATUTES—Repeal of Penal Statute — Effect — Continuance of Prosecution.   Under the common law the repeal of a penal statute operated as a remission of all penalties for violations thereof committed before its repeal, unless the repealing statute contained a provision expressly reserving the right to the state to

continue such prosecution, but under the Constitution and laws of our state this rule is abrogated; there being a constitutional provision and a general statute reserving this right to the state.

3.   **WORDS AND PHRASES** — ''Penalty''—''Liability''—''Forfeiture''—''Punishment.''   The words ''penalty,'' ''liability,'' and ''forfeiture'' are frequently treated as synonymous with the word ''punishment,'' in connection with crimes of the highest grade.

## ON REHEARING.

1.   **APPEAL** — Harmless Error—''Technicality''—Record — Presumption of Regularity.   (a) It amounts to a miscarriage of justice for an appellate court to reverse a conviction upon purely technical objections.

(b)   A technicality, within the meaning of section ''a'' of this syllabus, is a proposition of law which in the abstract is correct, but which does not involve the jurisdiction of the court or the substantial rights of the defendant.

(c)   If a principal of law has been violated during a trial, which involves the jurisdiction of the court, or which affects the substantial rights of the defendant, it will not constitute a technicality under section ''a'' of this syllabus, but will be reversible error.

(d)   The burden is on an appellant to show that the law was violated upon his trial in such a manner as to involve the jurisdiction of the court or to deprive him of a substantial right; unless this affirmatively appears from the record, where the evidence shows that a defendant is guilty, the appellate court has not the legal right or power to reverse a conviction.

(e)   There must be an end to litigation; every presumption must be indulged in favor of the regularity of proceedings in courts of record and in support of the verdicts of juries; and they will not be disturbed unless it affirmatively appears from the record that they are erroneous and that the defendant was injured thereby.

2.   **SAME**—Petition for Rehearing—Essentials.   In a petition for rehearing the grounds upon which it is sought must be distinctly and particularly set forth.

3.   **EVIDENCE**—Rebuttal.   Where a defendant places a witness upon the stand who testified in his behalf that a certain man was at a given place upon a given day, and the presence of said man at said place is material, the state on cross-examination or by direct evidence may show why said man was there.

4.   **LARCENY**—Harmless Error—Evidence—Ownership of Premises—Statements of Coconspirators.   (a)   Where a defendant is charged with larceny, and the ownership or control of a certain pasture, in which the stolen property was found, is in question, it is competent for the state to show that a year before the larceny was committed the defendant had used the said pasture or exercised control over it.   The length of time which had elapsed would go to the weight of the evidence and would not affect its admissibility.

(b) Where the evidence tends to establish a conspiracy to steal cattle and horses, conversations with, or statements to or by, persons who are connected with this conspiracy, and during its continuance, are admissible in evidence against any of the co-conspirators upon trial for larceny.

(c) If upon a trial for larceny a witness is erroneously permitted to testify to a statement made by him to a third party and further testifies that such statement was true, and it appears from the record that this statement was material to the issue of guilt or innocence, such positive and direct testimony given in court would cause the error, in allowing the witness to tell what he had said to the third party, to become harmless.

5. **WITNESSES** — Defense — Evidence — Self-Serving Declaration — Cross-Examination—Wife of Accused. (a) Where the wife of a defendant takes the stand for the purpose of proving an alibi in his behalf and testifies that he was at home with his family at the time of the commission of the crime but left home early on the following morning, it is competent for the state on cross-examination to ask said witness how long it was after the commission of said crime before defendant returned home.

(b) Where a defendant is charged with the commission of a crime and leaves the country and is gone for seven months, or any length of time, it is not competent for him to prove when he returned home or use in evidence any statements which he may have made as to where he had been, and what he had been doing in such absence, as such statements would clearly be self-serving declarations.

6. **EVIDENCE** — Accomplices — Corroboration—Instructions. For a correct instruction as to the testimony of an accomplice, see opinion.

(b) The law does not require the jury to find, beyond a reasonable doubt, that the testimony of an accomplice has been corroborated. All that is necessary is that there must be some other evidence tending to connect the defendant with the commission of the crime charged against him.

(c) Jurors are presumed to be men of ordinary intelligence and to understand the English language. It is therefore not necessary for the court in its instructions to define the meaning of the words, ''connect the defendant with the crime charged against him.''

7. **APPEAL**—Reduction of Sentence—Sufficiency of Evidence. (a) While this court has the power to modify a judgment and reduce a sentence inflicted by the jury or trial court, this power cannot be arbitrarily used, but can only be exercised where it appears from the record that an injustice has been done in assessing the punishment upon him.

(b) For circumstances which justified and required the infliction of the maximum punishment in a case of larceny, see opinion.

*Appeal from District Court, Carter County;*
*S. H. Russell, Judge.*

Oce Jones was convicted of larceny of animals, and appeals. Affirmed.

*Johnson & McGill* and *Cruce & Potter,* for plaintiff in error.

*Smith C. Matson,* Asst. Atty. Gen., for the State.

ARMSTRONG, P. J. The plaintiff in error, Oce Jones, was convicted at the November, 1911, term of the district court of Carter county on a charge of larceny of domestic animals, and his punishment fixed at imprisonment in the state penitentiary for a period of ten years. To review the judgment of conviction he has brought this appeal. The prosecuting witness, W. R. Cypert, and the accused were near neighbors, living in Carter county, Okla. On the night of January 18, 1911, four horses and one mule were stolen from Cypert, and were later found in the Arbuckle Mountains, in a pasture used by the accused. Warren Yell and Bryant Ballew were jointly charged with the offense. They testified against the accused that on the evening of the larceny he gave them $10 each to help him move the horses up into the Arbuckle Mountains to his pasture; that he told them he would see that they did not get into trouble. The accused bought some carbolic acid at Heflin's drug store just before the trip. This fact is testified to by witness Coffee and by the druggist Heflin. The three left Jones' house on horseback, the accused riding a large, brown bay horse, the property of Yell, the other two riding smaller horses; each horse being shod all round. They rode north to the pasture of prosecuting witness, and there found the horses and mule. The accused cut the wire fence with clippers, and they took four horses and one mule. They had some trouble catching the horses, and left one they could not get hold of. They left the field and traveled south along what the accused told his associates was the Ardmore road, for the purpose of turning people off their track and leaving the impression that the horses had gone south. After going some distance they doubled back on an old road, and went back north to the Arbuckle Mountains, to a pasture commonly known as "No Mans" pasture, in which the accused had been keeping

stock. It appears that this pasture is on top of the Arbuckles, and is made by adjoining landowners fencing their lands on all sides of it. No one seems to have any legitimate claim to the tract of land constituting this pasture. This is apparently a place scarcely ever visited, and practically impossible of being found except by those being very familiar with the surrounding country and its particular location. This place was reached early in the morning of January 19th, and is apparently about fifteen miles from where the horses were taken. After reaching the pasture the stock were rebranded with the carbolic acid purchased the day before at Heflin's drug store in Lone Grove. Three or four days later, when the horses were found, there were fresh brands on them which had the appearance of having been made by acid and bore the odor of carbolic acid. There was a leather halter on the mule, which was taken off and hidden under a rock. One of the accomplices told the officers where this halter could be found, and later took the officers to this place and the halter was so found. After branding the stock the parties separated; Jones going one direction, Yell and Ballew in another. It appears that the horse the accused rode on the night of the larceny belonged to accomplice Yell; that he recovered the same about a month later from a brother-in-law of the accused. Yell and Ballew were arrested a short time after the larceny. The accused was not located for six or seven months, and not until he came into Ardmore and surrendered to the officers. His family, however, continued to live at Lone Grove and near the town of Dixie.

The accused entered a plea of not guilty and undertook to establish an alibi. The principal witnesses testifying thereto were two brothers, and from a reading of the record it is not surprising that the jury found against him, as the testimony of these witnesses is thoroughly impeached by the state, and their stories are most unlikely. In fact there is very little straightforward, reasonable, convincing testimony on behalf of the accused. There are many other corroborating circumstances supporting the stories told by the accomplices, entirely sufficient in our judgment to warrant the finding of the jury. With this in view this

court will not reverse this judgment, in the absence of substantial errors of law.

The only material law point raised by counsel for plaintiff in error is based on the contention that the crime was committed on the 18th of January, 1911, and that the prosecution was not begun until August 31, 1911; that during this interim the Legislature repealed the statute under which the crime was prosecuted.

The statute on which the prosecution was based reads as follows:

"Any person in this state who shall steal any horse, cow or hog shall be guilty of a felony and upon conviction shall be punished by confinement in the state penitentiary for a term of not less than one year nor more than ten years; provided that where the horse or horses stolen are proven to be work stock the punishment shall be not less than three years nor more than ten years. The word 'horse' as used in this act shall include all animals of the equine species, and the word 'cow' shall include all animals of the bovine species." (Sess. Laws 1910, c. 98.)

The amendment which counsel contend repealed that statute is as follows:

"Section 1. That section 1, chapter 98, 1910, Session Laws of Oklahoma, be and the same is hereby amended to read as follows:

"Section 1. Any person in this state who shall steal any horse, shall be guilty of a felony and upon conviction shall be punished by confinement in the state penitentiary for a term of not less than five years nor more than ten years; and any person in this state who shall steal any cow, or hog shall be guilty of a felony and upon conviction shall be punished by confinement in the state penitentiary for a term of not less than two (2) years, nor more than ten years. The word 'horse' as used in this act, shall include all animals of the equine species, and the word 'cow' shall include all animals of the bovine species." (Sess. Laws 1911, c. 92.)

There are two reasons why this contention is not well founded, only one of which we will discuss.

Section 54 of article 5 of our Constitution is as follows:

"The repeal of a statute shall not revive a statute previously repealed by such statute, nor shall such repeal affect any ac-

crued right, or penalty incurred, or proceedings begun by virtue of such repealed statute."

Section 2972, Comp. Laws 1909, provides:

"The repeal of any statute by the Legislative Assembly shall not have the effect to release or extinguish any penalty, forfeiture or liability incurred under such statute, unless the repealing act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture or liability."

The construction of an identical statute was before the United States Supreme Court in the case of *U. S. v. Reisinger,* 128 U. S. 401, 9 Sup. Ct. 100, 32 L. Ed. 480, in which the court said:

"It is conceded that, under the general principles of the common law, the repeal of the penal statute operates as a remission of all penalties for violations of it committed before its repeal, and a release from prosecution therefor after said repeal, unless there be either a clause in the repealing statute, or a provision of some other statute, expressly authorizing such prosecution. In this case the court is of the opinion that section 13, Rev. Stat., contains such provision. It reads as follows: 'The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing act shall so expressly provide; and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.' This section, we think, clearly excepts offenses committed before the passage of the repealing act of 1884. To show this, it is only necessary to read the act of 1884 in connection with section 13, Rev. Stat., as one act. It would then be read substantially as follows: 'Be it enacted,' etc., 'that the act entitled "An act relating to claim agents and attorneys in pension cases," approved June 20th, 1878, is hereby repealed: Provided, that said repeal shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred thereunder, and that the same shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty or liability.' The only ground upon which the correctness of this interpretation may be doubted is that the words 'penalty,' 'liability,' and 'forfeiture' do not apply to crimes and the punishment therefor, such as we are now considering. We

cannot assent to this. These words have been used by the great masters of crown law and the elementary writers as synonymous with the word 'punishment,' in connection with crimes of the highest grade. Thus, Blackstone speaks of criminal law as that 'branch of jurisprudence which teaches of the nature, extent, and degrees of every crime, and adjusts to it its adequate and necessary penalty.' Alluding to the importance of this department of legal science, he says: 'The enacting of penalties to which a whole nation shall be subject should be calmly and maturely considered.' Referring to the unwise policy of inflicting capital punishment for certain comparatively slight offenses, he speaks of them as 'these outrageous penalties,' and repeatedly refers to laws that inflict the 'penalty of death.' He refers to the other acts prescribing certain punishments for treason as 'acts of pains and penalties.' That the Legislature intended that this thirteenth section should apply to all offenses is shown by section 5598, Rev. Stat., under the title of 'Repeal Provisions,' which is as follows: 'All offenses committed and all penalties or forfeitures incurred under any statute embraced in said Revision prior to said repeal, may be prosecuted and punished in the same manner and with the same effect as if said repeal had not been made.' "

Even though this view of the law had not been enunciated by the highest court of our land, we would feel inclined to announce the doctrine ourselves, in view of the fact that in this state our criminal laws, by legislative enactment, are entitled to a liberal construction, and without doubt the legislative enactment and provision of the article of the Constitution, *supra*, were intended for this very purpose. It follows that the court committed no error in overruling the demurrer.

A careful examination of the entire record discloses no error prejudicial to the substantial rights of the plaintiff in error. The judgment of the trial court is therefore in all things affirmed.

DOYLE, J., concurs. FURMAN, J., absent, and not participating.

## Opinion on Rehearing.

FURMAN, J. First. Owing to sickness, the writer did not participate in the consideration and decision of this cause when it was first submitted. As counsel for appellant are attorneys of the highest ability and integrity, and as they earnestly insist that the court in its original opinion overlooked material questions presented in their original brief, and as the punishment assessed against the appellant is the maximum of the law, the writer has carefully read and considered the entire record and the brief filed by counsel for appellant and will treat the questions presented as though the case was originally submitted for decision. Before discussing the matters relied upon, it may be well to state some general principles which control the action of the court in the determination of all cases submitted to it.

In the case of *George v. U. S.*, 1 Okla. Cr. 307, 97 Pac. 1052, 100 Pac. 46, this court said:

"We desire to reaffirm the announcement, heretofore made, that, when a defendant is clearly guilty, this court will not reverse a conviction upon a technicality or exception which does not affect the substantial rights of the defendant. This is the settled policy of this court."

This doctrine we have uniformly adhered to in all cases. We have at all times announced that every presumption must be indulged in favor of the regularity of the proceedings in courts of record and in support of the verdict of juries; and that error and injury must affirmatively appear from the record before a conviction will be reversed. These views have been stated in so many cases that it would be a useless consumption of time for us to cite the cases in which they were announced. We know that these positions of the court have been vigorously assailed by attorneys representing defendants ever since; but if we have ever varied from them we do not know it. Whatever may have been thought as to the right and power of the court to act upon these views at the time they were announced, there can be no question on that subject now.

Section 6005, Rev. Laws 1910, is as follows:

10 Cr.—7

"No judgment shall be set aside or new trial granted by any appellate court of this state in any case, civil or criminal, on the ground of misdirection of the jury or the improper admission or rejection of evidence, or as to error in any matter of pleading or procedure, unless, in the opinion of the court to which application is made, after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right."

Here is a legislative recognition and indorsement of all that we have ever said upon this subject; in fact, it is simply a restatement of the position assumed and maintained by this court from the day of its organization. In our opinion it would be a miscarriage of justice to reverse convictions upon any purely technical objections. We have been frequently asked, "What is a technicality?" Many different answers can be given to this question, which would not be applicable to the matter now before us; but, that the bar may more fully understand what our position is, we will say that a technicality, as applicable to the statute above quoted, is an abstract proposition of law, which is correct, but which does not involve the jurisdiction of the court or the substantial rights of the parties in the case under consideration. If a principle of law has been violated during a trial which involves the jurisdiction of the court or which affects the substantial rights of a defendant, it would not constitute a technicality, but, under the statute above quoted, such violation would amount to reversible error; but the burden is on the party who seeks a reversal to show that the law was violated in such a manner as to involve the jurisdiction of the court or to deprive the defendant of a substantial right; unless this is done, where the evidence shows that the defendant is guilty, this court has neither the legal right nor power to set aside a conviction. From this it appears that, although the trial court may have violated some abstract principle of law, yet, if such principle did not go to the jurisdiction of the court or affect the substantial rights of the defendant, an objection based upon such violation would be a mere technicality and not a ground for reversal. In this connection we deem it proper to restate

our position as to whether or not an error committed should be ground for reversal.

We are frequently asked the question, "How do you know that a given error did not deprive a defendant of a substantial right?" Our answer is that it is not necessary for us to know anything of the kind. For a full discussion of this question, see *Coleman v. State,* 6 Okla. Cr. 252, 118 Pac. 594; *Brown v. State,* 9 Okla. Cr. 382, 132 Pac. 359. If only those cases were to be affirmed which this court knew to be right, all convictions would be reversed, for it is always possible in any given case that the conviction may be wrong. Brutes act upon knowledge and instinct. Human beings act upon knowledge and belief. The sacred things of life are matters of belief. The dog knows his master, whom he has seen. The human being believes in and worships God, whom he has not seen. In all ages men have died for matters of belief. Such a thing as mathematical certainty cannot exist in the enforcement of law. All that courts and juries can act upon is belief to a moral certainty. A moral certainty always admits the possibility of error. Our statute was substantially taken from the decisions of this court and indorses them, for it says that no conviction shall be reversed "unless, in the opinion of the court to which application is made, after an examination of the entire record, that the error complained of has probably resulted in a miscarriage of justice or constitutes a substantial violation of a constitutional or statutory right." This is not only our opinion, but it is the statute law of Oklahoma. This is the yard stick of the law by which the rights of a convicted defendant must be measured. It will be well for counsel who appeal cases to this court to bear the decisions of this court and this statute in mind.

It is impossible for human wisdom to foresee and anticipate every contingency which may arise in the affairs of men; therefore the law cannot provide fixed rules applicable alike to all cases. The best that can be done is to provide general rules, which may or may not be applicable to a given case, according to its individual facts and circumstances. Of course this system is not perfect, and there is a possibility of mistakes; but it is

the best that poor, weak, erring mortals can do. It would take perfect men to make perfect laws and to perfectly enforce them. It is admitted that the wisest and best men sometimes make mistakes; therefore the best that we can do is to approximate justice as near as possible. It must always be remembered that the law is not and cannot be an exact science.

Second. The first proposition contained in the motion for rehearing is as follows:

"The plaintiff in error had fourteen assignments of error to which he had directed the attention of the court in his brief, and which were properly preserved on the trial, and in the opinion there is but one assignment of error discussed."

This proposition is entirely too general to receive consideration, in that it does not point out any specific error complained of and relied upon.

Third. The second proposition contained in the motion for rehearing is as follows:

"Because the court overlooked the principal assignment of error, where witnesses were asked about other horses which it was alleged the defendant, Oce Jones, had stolen, for which he had never been tried or convicted and was altogether a different transaction, which assignment is known as No. 8."

In their brief touching this matter counsel say:

"Eighth. The county attorney asked the witness Priest: 'Now you say Oce (meaning defendant) had some horses there in a stalk field about that time? Yes, sir. Did you know who owned the stalk field? Indians by the name of Sams own the land. Isn't it a fact that Mr. Meadows and others went up there and out of the stalk field, where Oce Jones had his horses there, that they got some other horses that had been stolen? (Objected to. The Court: It is admissible only as to why Meadows was up there. Exception.) Not that I know of. Don't you know that Meadows went up there looking for the Cook horses, and Gibson horses that had been stolen, and that they got them out of the stalk field where Oce Jones' horses were there? (Objected to, and court said: Admitted for the purpose of showing why Meadows was up there. Exception.) Meadows was up there looking for the horses? Yes, sir. And he got the horses, didn't he? Yes, sir. (Objected to. The court let him answer. Exception.)'"

In this connection it should be stated that the evidence above objected to was brought out by the county attorney on the cross-examination of the witness Priest when he had been placed upon the stand by appellant, and when his testimony was evidently intended to throw suspicion upon Meadows as the real thief. He testified that he had seen Meadows near the place where the stolen horses were found. Under these conditions it was proper for the state to show why Meadows was there. The ruling of the trial court is therefore approved.

Fourth. The next ground contended for in the motion for rehearing is as follows:

"Because the court overlooked the fifth and sixth assignments of error, where the trial court permitted witnesses to be asked about what other witnesses had told them, and that the witness had assisted the defendant in driving stock to a pasture a year previous, as a circumstance to show that the defendant was then in possession of the pasture which he had abandoned long prior to the offense charged against him."

In their brief counsel for appellant say:

"Fifth. Because the court permitted the witness Meadows, in testifying for the state, to testify that he had assisted the plaintiff in error in driving stock a year before to the pasture where the alleged stolen horses were found.

"Sixth. The court erred in permitting the witness Holden to testify he told a man named Simmons that the brand on a mare ridden by plaintiff in error looked like an acid brand."

The record shows that the stolen property was found in a certain pasture on the top of Arbuckle Mountains, in Carter county, which was known as "No Man's Pasture." It was proven by one witness residing near this pasture, and who was evidently a friend of appellant, that he had heard appellant claiming the pasture in which the stock was found. No one else was shown to have ever made any claim to it. The testimony of the witness Meadows that about a year before the larceny he had assisted appellant in driving stock into this pasture tended to prove that appellant was asserting an interest in it. The length of time that had elapsed merely went to the weight of the testimony and did not in any manner affect its admissibility. The admission of the testimony of the witness Holden as to what he had said

to Simmons cannot be regarded as reversible error. Simmons came to the home of Holden with appellant, and the circumstances strongly indicate that Simmons was connected with appellant in a general conspiracy to steal stock. In fact, the evidence in the case is strongly suggestive of the idea that a general conspiracy existed between appellant and many of those with whom he was associated to steal horses and cattle, and that No Man's Pasture was the common place for concealing said stock; but even if Simmons was not acting in the common conspiracy with appellant, and such evidence was not admissible upon this ground, its admission was harmless error, because Holden, while on the witness stand, testified positively that the brand on the mare ridden by appellant looked like an acid brand. This was material to the case, because it was proven that, on the evening before the larceny was committed, appellant had purchased carbolic acid from Dr. Heflin in the town of Lone Grove, and that the stolen horses when found in No Man's Pasture had had their brands altered by an application of carbolic acid. All of these circumstances tended to prove the guilt of appellant, and the trial court did not err in the admission of the testimony complained of.

Fifth. The next ground set up in the motion for rehearing is as follows:

"Because the court overlooked the fifth, sixth, eighth, ninth, and tenth assignments of error, because according to a previous decision rendered by this court the evidence was inadmissible and was sufficient to reverse the cause for a new trial."

We have already disposed of the fifth, sixth, and eighth assignments of error. We will now consider the ninth and tenth assignments.

When Mrs. Jones, the wife of appellant, was on the stand, she was asked by the county attorney:

"You say Mr. Jones left home on the morning of the 19th (January)? Yes, sir. How long after that until Mr. Jones was back? (Objected to. Overruled. Exception reserved.) I reckon it was in August. You know when he surrendered to Buck Garrett down here."

Mrs. Jones had taken the witness stand to testify to an alibi in behalf of her husband. She swore that he was at home on the night of the 18th of January, the night on which the horses were stolen, and that he left early on the morning of the 19th. It was competent for the county attorney to show when appellant left home and how long he remained away. This went to prove, in connection with other evidence, that immediately after the larceny of the horses in question appellant became a fugitive from justice and was gone from home about seven months. This evidence was competent and admissible. Counsel for appellant then asked Mrs. Jones the following question:

"I will ask you whether or not Mr. Jones, when he came back, told you where he had been? If he didn't tell you that he had been in Arizona?"

To this question the county attorney objected, and the objection was sustained by the court, to which counsel for appellant excepted. There was no error in the ruling of the court. Any statements which appellant may have made to his wife, under the circumstances, would have been self-serving declarations. Defendants cannot commit crimes, flee the country, and take seven months to think about the matter, and then come home and manufacture evidence in their own behalf. We therefore find that the rulings of the trial court were in all respects correct.

Sixth. The next ground set up in the motion for rehearing is as follows:

"Because the court overlooked exception No. 14 to the instructions of the trial court, the same being in paragraph No. 5, an instruction on the weight of the evidence, which this court has frequently held was reversible error."

The instruction of the court complained of is as follows:

"You are instructed that two of the state's witnesses, Warren Yell and Bryant Ballew, have admitted to the jury that they were principals in the crime alleged in the information; hence you are told that they, being parties to the larceny in this case (that is, parties principal to said crime, if the crime was committed), have been introduced as witnesses in behalf of the state and by their admissions are what is known as principals or accomplices to whatever crime was committed, and you are instructed that it is the law that no person can be convicted upon

the testimony of an accomplice or accomplices, unless there is other evidence in the case tending to connect the defendant with the commission of the offense, and you are told that the corroboration by other evidence, if there be such, is insufficient if it merely shows the commission of the crime and the circumstances thereof, but such other evidence, to be sufficient to corroborate an accomplice or accomplices, must tend to connect the defendant with the commission of the crime charged against him."

In their brief counsel for appellant complain of this instruction in the following language:

"Paragraph No. 5, where it uses the language, 'But such evidence, to be sufficient to corroborate an accomplice or accomplices, must tend to connect the defendant with a crime charged against him,' without stating that, if they have reasonable doubt as to the fact, they would acquit the defendant, and without defining what was meant by the words 'connect the defendant with the crime charged against him.'"

If this court has ever rendered an opinion sustaining the above contention of counsel for appellant, we are not aware of it, and, if such opinion is in existence, it is hereby expressly overruled. There is no law requiring a jury to find beyond a reasonable doubt that an accomplice's testimony has been corroborated by other evidence tending to connect the defendant with the commission of the crime charged against him. Under the common law a conviction could be sustained upon the uncorroborated testimony of an accomplice, but our statute has mitigated this hardship of the common law and now requires that there must be some evidence other than that of an accomplice tending to connect a defendant with the commission of the crime charged. See *Alderman v. Territory*, 1 Okla. Cr. 562, 98 Pac. 1026. This is all the law requires. Neither is it necessary for the court to define the meaning of the words "connect the defendant with the crime charged against him." These are words used in the common everyday affairs of life, and have no technical meaning and are well understood by all persons of ordinary intelligence. This court presumes that jurors are men of common intelligence, and understand the English language. If this be not true, it was the duty of counsel for appellant to object to

their serving on the jury. We think that the law was clearly and admirably stated by the trial judge, and the instruction is in all things approved and indorsed; but even if there was error in the instruction given, in the light of the overwhelming and conclusive evidence as to the guilt of appellant, this court would hesitate long before granting him a rehearing.

Seventh. The last ground relied upon in the motion for rehearing is as follows:

"Because the court overlooked that portion of the brief directing the attention of the court to the excessive punishment inflicted in this case, and if, upon a hearing, it is concluded that the cause should be affirmed, we respectfully suggest that the punishment should be reduced to be in harmony with the gravity of the offense."

It is true that this court has the power to modify a judgment and reduce a sentence, when from the record it appears that an injustice has been done by inflicting an excessive punishment, but this power cannot be arbitrarily used. See *Newton Henry v. State, ante,* 136 Pac. 982.

In the light of the testimony in this case, we think the jury were fully justified in assessing the penalty of ten years' confinement in the penitentiary. We believe that the appellant is not only guilty of the crime of which he was convicted, but that the evidence justified the jury in believing that he was an old and experienced criminal and was a corruptor of the youth of the country. In fact, from the evidence in the record, he might be called an instructor in the art of larceny. He induced two young boys, about nineteen years of age, to join with him in the commission of this crime, and after it was committed he fled the country and was gone for seven months, during which time he was evidently manufacturing an alibi. Two of the witnesses who testified in his behalf were directly impeached by the state's evidence. The others testified to the most improbable stories, and the jury doubtless came to the conclusion that their testimony was manufactured from beginning to end. Without disrespect to the counsel for appellant, we cannot see how any impartial, fair-minded, or intelligent man can read the record and come to any other conclusion. Upon the trial appellant did not take

the stand in his own behalf and deny or explain a single word of testimony against him. It is true that this could not be considered by the jury in determining his guilt; but after his guilt has been established and he comes to this court and seeks to have the verdict of the jury set aside, or the judgment modified, this court cannot overlook the fact that appellant did not dare to go upon the witness stand in his own behalf. Men who steal the property of others in the dead hours of night, and who induce boys to do so, and then come into court with evidently manufactured evidence, should receive the extreme penalty of the law; in fact, the longer such men are locked up in the penitentiary the better it is for society. Honest people must have protection against such characters, or the courts are a farce, and law is a mockery, a snare, and a delusion.

We find no error in the trial in the lower court. We do not see how the jury could have come to any other conclusion than that appellant was guilty, and we think that his punishment was less than he deserves. The judgment of the lower court is in all things affirmed. The mandate will issue at once. Justice has too long been delayed in this case.

ARMSTRONG, P. J., and DOYLE, J., concur.