# BUCK JANEWAY v. STATE.

No. A-9191.  Aug. 20, 1937.
(71 Pac. 2d 130.)

J. N. Fortner, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., and C. D. Wilkinson, Co. Atty., for the State.

BAREFOOT, J. The defendant, Buck Janeway, was charged with the murder of "Pee Wee Moore" in McCurtain county, Okla., on or about July 20, 1935. He was tried and convicted and given a life sentence. From this judgment, he has appealed.

The record in this case reveals the following facts: The defendant had served a term in the Oklahoma penitentiary for forgery, and had just been released from the Texas penitentiary, where he had finished serving a term for burglary. The deceased was serving a term in the Arkansas penitentiary for bank robbery, but had been released on a furlough, which had expired at the time he was killed by defendant. These parties met in the Kilgore, Tex., oil field and came to McCurtain county, Okla., where the deceased Moore had lived prior to this time. The defendant stopped at the home of Ted Futrell, where he was working for his board. The deceased was at the home of Forney Jones, which was not far distant. On the morning of the difficulty the deceased and Forney Jones came by in a car and picked up the defendant, asking him to go with them for a ride. They drove along No. 70 highway toward Broken Bow and picked up two girls who rode with them to the edge of the town and were let out because the men did not desire to go into the town. They had whisky in the car and all were drinking. The defendant was sitting in the back seat, and the deceased, who was driving, and Forney Jones were sitting in the front seat. They drove back toward the place from which they started and picked up two men who were beside the road and whom no one ever seemed to identify. They

drove around through the country all day, drinking and going swimming, and the two men were let out of the car late in the evening. There seemed to be quarreling and cursing among the men, and defendant testified that deceased had proposed that they go to Nebraska and rob a bank; that he had refused to do so, for the reason that he had been in enough trouble and intended to go straight; that upon his refusal deceased had threatened to kill him, and "called me a yellow son of a bitch, and said if I wouldn't help rob a bank he would kill me. I knowed too damn much anyway"; and that "he would make me dig my grave before night." Both defendant and deceased were armed with six-shooters. After all these statements were made, they continued riding over the country and late in the afternoon went in swimming, with the exception of Forney Jones.

Early in the night the defendant, the deceased, and Forney Jones were in the car and turned off of No. 70 highway into a side road. Defendant, as a witness in his own behalf, testified as follows:

"Q. And what did the deceased do? A. And the deceased stopped and said, 'You son of a bitch, here is where I leave you.' He reached to get his pistol and raised up and I stuck my pistol in his belt and shot him. Q. How many times? A. Twice or three times. Q. Why did you shoot him? A. Because he said he was going to kill me. Q. Did he state 'Here is where I leave you?' A. Yes, sir. Q. Did he have his gun in his hand? A. He did. Q. After that why didn't you tell anybody, the people, that you killed him? A. I was a stranger, didn't know anybody, and just out of the penitentiary, and afraid I would get into worse trouble and I told Forney Jones if he knew any place we could take him and throw him out. He said he knew a place and we carried him there and taken him out. Forney got him by the feet and I got him by the

hands and we laid him down, and come back and took
Forney home. And Ted went and waked Bill and we
got in the car and went to Big Boy's and dug a well for
old man Futrell. I stayed two weeks, I think. And we
come back and went to Bert Harbison's and stayed there
until I was arrested."

The other eyewitness, Forney Jones, who was sitting
in the front seat, testified as follows:

"Q. You were still traveling north when the shooting
took place? A. Yes, sir. Q. How many shots were fired?
A. I would say two, and I don't know how many more.
Q. Were there any more? A. I wouldn't say, but I would
say two. Q. You do know there was two shots fired? A.
Bound to have been two. Q. At the time you heard the
first shot, state whether or not the car was in motion?
By Mr. Fortner: We object as leading, whether or not,
all he has to say is yes. Let him answer the question.
The county attorney is unfair. By Mr. Wilkinson: I
asked him if it was moving and it might not have been.
By the Court: I don't think it is leading. (Q.) Was the
car moving or standing still? A. It was coming to a stop.
Q. But it was in motion? A. Mighty little. It was stop-
ping. There is a big ditch on the tram and a branch on
the south side of the tram, the trees going east and west,
throwed it almost as near as them fences over there and
he got on top of the tram and checked. That is when
the shooting taken place. Q. When the car run into the
ditch and began to take the incline what was Moore do-
ing, what did he do? A. Well, I don't know. Any way
he fell in my lap, dead, and was shot. Q. But before the
shooting? A. He wasn't doing nothing but driving. Q.
At the time the first shot was fired what happened to
Moore? A. I don't know about the first shot. It was
all done at once. Q. How were the shots fired, tell the
jury whether they were fast or slow. A. Oh, they were
fast. Yes sir, they was right fast. What I think— By
Mr. Fortner: We object to what he thinks. By the Court:
Don't tell what you think. By Mr. Wilkinson: I am not
asking him. I want him to tell what he saw and what

he knows. (Q.) What happened to Moore when the shooting occurred? A. He just pitched over in my lap. I was to the right of him, he was under the wheel. He fell in my lap like this, and his head in my lap. Q. What did the defendant do? A. The defendant he reached over and got a gun, Moore's gun, I reckon. Any way it was there and he got that gun and opened the door and got out and opened the other door and got in there. Q. What side of the car did he get in on? A. The driver's side. Q. What did you do? A. He went to turning it around. He said, 'Do you know of any roads in the country?' I said, 'Yes'. He turned around and got to the highway and turned east and it wasn't but a few minutes he got about six or seven miles into Arkansas. Q. Did he say anything to you or ask you about any road, or what he wanted? A. No, sir. By Mr. Fortner: Objected to as leading. By the Court: Overruled. By Mr. Fortner: Exception. A. What did you ask? Q. What did he say about the roads? A. Just asked me if I knew of a by-road that turned off from the main road. Q. What did you tell him? A. I told him, 'Yes.' Q. Where did you go? A. Turned right around until we went in an old field and there he whipped the car around and turned back south and—and in a little bit at about 75 miles an hour we was in Arkansas. Q. On your way toward Arkansas, or De-Queen, tell the jury whether or not you passed Ted Futrell's place? A. Yes, sir. Q. Did you stop there? A. No, sir. Q. Where did you take the body of the deceased and what did you do with it? A. We taken it, couldn't turn off of none of the other roads, they was all so short I was afraid he would wreck it. When I seen we were in Arkansas— By Mr. Fortner: We object to what he knows, let him answer the question. By the Court: He is telling about the way they did with the body and where it was placed. Let him answer. By Mr. Fortner: Exception. A. There was good roads that turned off of 70. They fork and one goes to Chapel Hill and one to the north, a good smooth turn around. I began to tell him about a half a mile to that turn, I was afraid he would kill us all—wouldn't kill us all but me and him. He turned at

it and got into the old field. He said, 'Anybody live here?' I said, 'I don't believe there is.' He got out on his side, come and opened my side and I stepped out, and pulled him out and pulled him out on the side of the road about ten steps perhaps. Q. What did he say when you got to that point? A. He said not to say nothing, and I said 'Sure not.' I admit I was scared, all right. Q. You say he got out first? A. Yes, sir. Q. On the lefthand side? A. I wasn't telling anybody to do anything, I was taking orders."

The officers, who found the body of deceased several days after the killing, testified that from the examination of the body, which was badly decomposed, they found that deceased had been shot in the back of the head near the base of the skull, and that another shot had entered the right side of the body about an inch below the nipple. Other witnesses testified to seeing the defendant on the day after the killing occurred, and to the fact that his clothes were bloody, that he was in possession of the car and driving the same, and that the front seat of the car was covered with blood.

The defendant, for a reversal of this case, contends that the court erred in the admittance of certain testimony over his exception, and that the court erred in permitting the county attorney to argue this evidence to the jury over his exception. Both of these contentions can be examined together. The defendant, while being cross-examined by the county attorney, testified as follows:

"Q. When you wouldn't go to Nebraska with these fellows, you say you didn't want to get into any more trouble? A. Yes, sir. Q. And since that time, while living at Bert Harbison's, you did participate in a bank robbery at Horatio, didn't you? A. I was accused of it. By Mr. Fortner: We object as incompetent, irrelevant, and immaterial. By Mr. Wilkinson: He started that racket. By the Court: Gentlemen of the Jury, the Court

is about to excuse you for a few minutes to settle a little question of law. (Thereupon, the jury is withdrawn under the admonition of the court, and, after hearing the matter presented by counsel, proceedings had as follows, to wit). By the Court: The objection will be overruled and defendant's exceptions allowed. By Mr. Fortner: Comes now the defendant and further objects to the question for the reason that it is not proper cross-examination, tends to put in issue his reputation, which he has not done, and that the question is highly prejudicial to his rights, and asks the court to instruct the jury to disregard the question. By the Court: Which is by the court refused, and exception allowed. By Mr. Fortner: Comes now the defendant and asks the court to declare a mistrial for the reason that an issue has been raised in court that the defendant has no chance to meet, upon the charge of another crime attempted to be proved against him, jeopardizing his rights before the jury, and is highly prejudicial to him in this case. By the Court: The request will be refused, and exception allowed. (Thereupon the jury is recalled and proceedings had as follows, to wit) By Mr. Coker (Q.): Now, Mr. Janeway, up there on the creek, when Pee Wee Moore, in company with the other men, proposed to you that you go to Nebraska with them to rob a bank, what did you tell them? A. I told them I didn't want to rob no bank. Q. You heard Mr. Fortner make his statement to the jury? A. Yes, sir. Q. Did you tell them, as stated in your opening statement, that you were just out of trouble in Texas and was going straight? A. I did. And I told him in the first place, were we in Nebraska, I knew that country and it would be foolish even if he went to rob a bank there, if he wanted to rob one. Q. And furthermore that you had just got out of trouble in Texas and you were going straight? A. Yes, sir. Q. And that is the reason you didn't want to help him rob a bank? A. That is it. Q. Since that date, since the time you killed Pee Wee Moore, as you testified, and that you had been in McCurtain county, living at Bert Harbison's I will ask you if you didn't, with Buzby and Holmes, participate in a bank robbery at Horatio and have been iden-

tified as one of the participants? By Mr. Fortner: I want to be sure I have the record in properly. He has asked another question. I want to make my objection now. By the Court: Objection overruled, exception allowed. By Mr. Fortner: For the reason that it is improper cross-examination for the reason that it is an attempt to prove the reputation of the defendant, which has not been put in issue by him. By Mr. Coker: (Q.): What is your answer? A. I have been accused of it. Q. I am asking did you participate in that robbery? A. No. By Mr. Fortner: Objected to as incompetent, irrelevant and immaterial, and. asking the defendant to incriminate himself in a matter which is not material to the issues in this trial."

On redirect examination, the defendant, in answer to certain questions propounded by his attorney, said:

"Q. Mr. Janeway, they have gone into something about the Horatio Bank? A. Yes, sir. Q. You say somebody accused you of it? A. Yes, sir, that is what they told me. These officers say I have been accused of it."

It is contended by the state that the defendant, having on direct examination testified that he had refused to join in the robbery of the Nebraska bank for the reason that he had theretofore been in trouble and desired to go straight, the state, on cross-examination, was entitled to ask the questions above set forth in order to controvert his testimony.

From the evidence above quoted, it will be observed that the defendant, by his direct testimony, sought to take advantage of the proposition that when he had been asked by deceased to join him in robbing a bank in Nebraska, he refused, with the statement that he had been in enough trouble and desired to go straight. If the jury believed this statement to be true, it was of material benefit to the defendant and would have no doubt been given great weight by the jury in considering the defense ad-

vanced by him. Having raised this issue, which was to his advantage, and under the general rule governing the right of cross-examination of a defendant who takes the witness stand in his own behalf, it was proper to permit the state to cross-examine him with regard to his conduct, since he had been in trouble in Texas and as to whether he was really speaking the truth when he said it was his desire to go straight. Certainly, the defendant should not be permitted to put his good faith in issue and receive the benefit of it before the jury, and then the state be denied the right to cross-examine him and show by this cross-examination that he had made no effort to do so, but, on the other hand, had been charged with the commission of another offense.

The rule that a defendant is to be tried for the offenese for which he stands charged, and that evidence of other crimes may not be given, must be considered with the equally well-settled rule that when a defendant takes the witness stand in his own behalf, and on direct examination puts in issue the question of his good faith, then the state, on cross-examination, shall have the right to examine the defendant with reference thereto. Evidence material to the issues involved in the case on trial is not rendered incompetent merely because it may tend to prove the defendant guilty of another offense. The testimony in this case was brought out on cross-examination, and by way of rebuttal.

A case decided by this court, Creek v. State, 16 Okla. Cr. 492, 184 Pac. 917, 918, is nearer in point than any we have read upon this proposition. In this case the defendant was charged with murder and was convicted of manslaughter in the first degree. The defendant, while on the witness stand, testified that immediately after the

killing he called the sheriff over the phone and requested the sheriff to come and arrest him; that he did not resist arrest as some of the witnesses for the state had testified. On cross-examination the county attorney was permitted to examine him with reference to his attempt to escape jail and flee upon two different occasions after he was taken into custody. Judge Matson, in holding the evidence admissible, says:

"The defendant, claiming to have been so zealous in his efforts to surrender and place himself in the hands of the law immediately after the commission of the alleged offense, cannot complain of a cross-examination which in effect had bearing on the question of his good faith surrender by disclosing a disposition on the part of the defendant to escape jail and flee on two different occasions after he was taken into custody. * * *

"A sharp conflict thereupon arose between the testimony of the witnesses for the state and the testimony of the defendant himself. According to the state's witnesses, the defendant made armed resistance to arrest. This fact was strenuously denied by the defendant, who stated that he was at all times willing to submit to arrest, going so far as to telephone the sheriff to that effect. To rebut the presumption that the defendant was willing to submit to arrest, as testified to by him in chief, and in support of the testimony of the state's witnesses to the effect that the defendant had resisted arrest, the court permitted the county attorney, in his cross-examination of the defendant, to ask the defendant about his escaping from jail on two different occasions and while awaiting trial. We think this cross-examination was proper under the issues in this case.

"A defendant offering himself as a witness subjects himself, as regards cross-examination, to all the rules governing other witnesses. Harrold v. Territory, 18 Okla. 395, 89 Pac. 202, 10 L. R. A. (N. S.) 604, 11 Ann. Cas. 818; State v. Lewis, 56 Kan. 374, 43 Pac. 265; State v.

King, 67 Wash. 651, 122 Pac. 323. The foregoing is the established rule in this jurisdiction." See, also, Ditmore v. State, 49 Okla. Cr. 228, 293 Pac. 581; Gibbons v. State, 34 Okla. Cr. 407, 246 Pac. 1107; Gibbons v. Territory, 5 Okla. Cr. 212, 115 Pac. 129.

We have read and examined all of the cases cited by defendant. They support the general rule that the issue in a criminal trial is single, and a person on trial for one offense cannot have proof introduced against him showing that he committed other offenses, except as indicated in said opinions. But this does not conflict with the rule which gives the state the right to cross-examine the defendant when he takes the stand in his own behalf, as above indicated. In practically all of the cases cited in defendant's brief, the defendant did not even take the stand, and the evidence was direct and not on cross-examination. These cases are: Smith v. State, 5 Okla. Cr. 67, 68, 113 Pac. 204; People v. Schweitzer, 23 Mich. 301; Satterfield v. State, 32 Okla. Cr. 98, 240 Pac. 151; Cantrell v. State, 12 Okla. Cr. 534, 159 Pac. 1092; Vickers v. U. S., 1 Okla. Cr. 452, 98 Pac. 467; People v. Flanigan, 42 App. Div. 318, 59 N. Y. S. 101.

The evidence in this case shows that the killing of deceased by defendant was more the result of fear than of self-defense. The deceased was shot in the back of the head at a time when he was sitting in the front seat of an automobile, driving the car. The only eyewitness, other than defendant, testified that deceased, at the time he was shot, was not doing anything but driving the automobile; that he had just stopped the car; that he did not hear the deceased make any statement, and that defendant shot him at least twice; that deceased fell over in his lap. It may be that defendant was afraid that deceased would kill him, as he testified, but this did not justify him

in shooting deceased in the back of the head, as the evidence showed. He had ample opportunity during the day to leave the presence of deceased after any threats about which he testified were made. His actions in taking the body of the deceased for many miles and on to a side road where it was dumped out and left, his appropriation of the automobile of the deceased, and his not reporting to the officers or any one else, do not show the actions of a man who killed some one in self-defense.

Under the harmless error doctrine, which has been firmly established in this court since its creation, and in construing the statutes of this state, sections 3206-3210, Okla. St. 1931, 22 Okla. St. Ann. §§ 1068-1071, 1273, this court, in many cases, has held that when the evidence is clear as to the guilt of a defendant, and there is no reason to believe that upon a second trial an intelligent and honest jury can arrive at any other verdict than that of the guilt of the accused, the judgment of the lower court will not be set aside for anything less than fundamental errors. Jones v. State, 10 Okla. Cr. 216, 136 Pac. 182, 137 Pac. 121; Carter v. State, 6 Okla. Cr. 232, 118 Pac. 264; Smith v. State, 6 Okla. Cr. 380, 118 Pac. 1003.

From the above statement, we find that no error was committed by the county attorney in his closing argument which affected the substantial rights of the defendant, and the judgment of the district court of McCurtain county is therefore affirmed.

DAVENPORT, P. J., and DOYLE, J., concur.