Jonas Rusty LOWE, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F-75-195.

Court of Criminal Appeals of Oklahoma.

Sept. 22, 1975.

Harris, Gladd & Dyer by Marion M. Dyer, Tulsa, Court Appointed, for appellant.

Larry Derryberry, Atty. Gen., James L. Swartz, Asst. Atty. Gen., Jim Patton, Legal Intern, for appellee.

## OPINION

BUSSEY, Judge:

Appellant, Jonas Rusty Lowe, hereinafter referred to as defendant, was charged and tried in the District Court, Okmulgee County, Case No. CRF–73–116, for the offense of Second Degree Murder. The jury found him guilty of the lesser included offense of First Degree Manslaughter, in violation of 21 O.S.1971, § 711, ¶ 2, and fixed his punishment at ten (10) years' imprisonment. From said judgment and sentence a timely appeal has been perfected to this Court.

At the trial Everett Clayton, an Okmulgee County Deputy Sheriff, first testified for the State that in the early afternoon of Saturday, November 10, 1973, he was dispatched to a trailer house rented by one McLemore and located in the town of Morris, Okmulgee County, Oklahoma. The trailer was described as being about eight feet wide and forty feet long, with the living room being eighteen feet long, and a diagram of the interior of the trailer was displayed upon a blackboard. Exhibit No. 1 was identified as a picture of a blood-stained mud puddle in which the body of Rubin Factor was reportedly found approximately 100 feet from the front door of the trailer. Exhibit No. 2 was identified as a picture of the trailer doorway depicting blood stains on the carpet. Exhibits Nos. 3 and 4 were identified as pictures of the deceased taken after his removal from that location, with Exhibit No. 3 revealing a slash injury near the left eye and Exhibit No. 4 a stab wound to the left side of the chest. Exhibits Nos. 1 through 4 were admitted into evidence. While in custody on that same afternoon, the defendant admitted the stabbing, after having been advised of his rights, but further stated that he had not intended to do so. On November 12, 1973, the defendant was interrogated by the prosecuting attorney after again being advised of his rights in the presence of the witness. The defendant then stated that when he became engaged in an argument with Gloria Lowe, his former wife, Rubin Factor knocked him to the floor. After being separated by other persons present, the defendant asked Jonas Lena for a knife, opened it, and slashed and stabbed at the deceased to scare him. After the deceased ran from the trailer, the defendant gave the knife back to Jonas Lena. At that time, the defendant acknowledged that a knife, then in possession of the witness, appeared to be the one so utilized.

Hattie Carter then testified that she lived near the subject trailer house, and had found a knife under a bush at her residence on the day following the fatal altercation. Upon discovery of the knife, she called Deputy Junior Stafford who took possession thereof, and Exhibit No. 5 was identified as appearing to be the same knife.

Olan Stafford, Jr., who was previously an Okmulgee County Deputy Sheriff, next

confirmed the testimony of the previous witness as to the circumstances under which he obtained possession of the knife, and further testified that he delivered the same to Deputy Everett Clayton. The knife was described as a foreign-made switch-blade with a black handle and a four inch stainless steel blade. Exhibit No. 5 was identified as appearing to be the same knife.

Deputy Everett Clayton was then re-called and identified Exhibit No. 5 as the knife he received from Junior Stafford and delivered to Agent Vernon Glenn of the Oklahoma State Crime Bureau.

Vernon Glenn, an agent with the Oklahoma State Bureau of Investigation, then testified that he received Exhibit No. 5 from Deputy Everett Clayton and delivered the same, sealed in an evidence envelope, Exhibit No. 6 to the laboratory at his head-quarters for blood stain analysis.

William J. Caveny, a forensic chemist with the Oklahoma State Bureau of Investigation, next identified Exhibit No. 6 as an evidence envelope submitted to that laboratory by Agent Glenn, and containing Exhibit No. 5 for blood stain analysis. In his examination of that knife, he was able to determine that the blade contained stains which were Group B human blood. Of the four generally recognized blood types, he further testified that Group B is the second most rare.

Donald Johnson, M.D., specializing in pathology, then testified that he performed an autopsy on the body of Rubin Factor, a 17-year-old male, 5 feet 6 inches in height, weighing approximately 145 pounds, and determined the cause of death to have been massive hemorrhage into the space normally occupied by the lungs as a result of a stab or puncture wound which penetrated the lungs and heart. The wound was described as being about five-eighths of an inch in width near the entrance, somewhat underneath the left nipple, and approximately three inches in depth. Exhibit No. 4 was identified as a picture depicting that injury upon the deceased. On hypothetical examination, he testified that this injury was compatible with that which could be produced by Exhibit No. 5, and that to inflict the wound with this exhibit would require considerable force. He also observed a two and one-half inch laceration extending deep into the skin above the left eyebrow, and two abrasions about the eyebrow measuring one-half and three-quarters inch. Examination of the blood revealed a blood alcohol concentration of 0.21% weight per volume, and he further expressed the opinion that the deceased had been intoxicated.

Jim Darnell, a relief police officer in Morris, next testified that he was summoned to the subject location on November 10, 1973. There were several people present upon his arrival, and the defendant approached him with his hands out and stated, "take me in, I did it." (Tr. 115) Somewhat near the trailer house he found the body of a person identified to him as Rubin Factor lying in the mud. He could not locate a pulse and radioed for an ambulance and other assistance as the victim appeared to be dead. Stains resembling blood spots were discovered on the carpet in the trailer house. Other officers soon arrived taking charge of the investigation and placing the defendant in custody.

James Thomason, an apprentice technician for Buchanan Funeral Home, then testified that he was sent to Morris on November 10, 1973, where he found a person lying in the mud with wounds on his left forehead and chest. He could not locate any vital signs, but administered cardiac massage while transporting him in an ambulance to Okmulgee Memorial Hospital.

Wayne Payne testified that he was at a carwash near Morris on November 10, 1973, when he discovered a person he subsequently recognized as Rubin Factor lying in the mud in an alley. As he approached, the victim emitted a snort, or gasp. The witness then attempted to wipe some of the mud from the victim's face, but the latter could not speak. The victim was alone when discovered, but several others, includ-

ing the defendant, soon gathered about him. While a young girl was holding the victim's head in her lap and wiping mud from his face, the defendant said that he was sorry. This witness also confirmed the aforesaid inculpatory remark of the defendant upon the subsequent arrival of Officer Darnell.

The remaining six witnesses testifying in behalf of the State were among those present at the time of the subject altercation, and included: Lindell Berryhill; Richard Factor; Yarma Tarpaleechee; Jonas Lena; Gloria Ann Lowe, a sister of the deceased and former wife of the defendant; and Lyna Mae Artusse. Collectively, their testimony tended to establish that the deceased, Rubin "Hutke" Factor, the defendant, and several other persons were gathered at the McLemore trailer house in Morris in the early afternoon of the day of the fatal altercation. They were playing cards and watching a football game on television, and beer as well as some wine was being consummed. The defendant then became embroiled in an argument with his ex-wife. He was very angry because she had seen another man the previous weekend, and threatened to cut up her face with a knife so that no other man would want to see her. She then began to cry and the deceased attempted to comfort her. The defendant and the deceased then exchanged remarks regarding that incident, and the deceased struck the defendant to the floor, occuping a position on top of the defendant when others then separated them. The deceased did not attempt to renew the conflict, but the defendant continued to insist on fighting outside. As the controversy began to subside, the defendant stated that he was going to buy a knife on Monday, and the deceased should look forward to seeing him next weekend. The deceased then replied that the defendant would have to kill him, and the defendant responded that he would. The defendant then obtained a knife, Exhibit No. 5, from Jonas Lena and swung the open knife about with his hand, while others attempt-

ed to disarm him and further separate him from the deceased who was unarmed. None of the witnesses observed the defendant strike the deceased with the knife, but the deceased soon left the trailer alone, bleeding about the head and holding his side. The defendant then returned the knife to Jonas Lena, and when his ex-wife began crying the defendant stated that he had not hurt the deceased and had only scratched him. Shortly thereafter, the deceased was found nearby lying in the mud with blood and mud about his face and shirt, and the defendant told his ex-wife, "I'm sorry, I'm sorry, I didn't mean to, I didn't mean to." (Tr. 225–226) Upon discovery of the body, Jonas Lena dropped the knife by a nearby bush. Although Lyna Mae Artusse testified that Jonas Lena offered the knife to the defendant immediately prior to the second altercation, Jonas Lena testified that he told the defendant to leave the deceased alone but gave him the knife unopened at defendant's request.

Gloria Lowe was then recalled to testify as the first witness in behalf of the defense. The only testimony solicited was that the deceased was left-handed.

W. R. Fulton, the prosecutor and an Assistant District Attorney for Okmulgee County, was then called and confirmed the previous testimony of Deputy Clayton regarding the prosecutor's interrogation of defendant, and further testified that he had taken notes of that interrogation and preserved them for almost a year.

The defendant, age 27, then testified and generally confirmed the events surrounding the subject altercation. However, he testified that he and his ex-wife were attempting a reconciliation, and he became angry at the trailer house because that was where she had gone with another man the previous week. He also related that in the first altercation the deceased struck him several times while on the floor, but he did not strike the deceased. After that struggle he admitted being angry and threatening to use a knife on the defendant as well

as declaring that he was going to buy one on Monday, but he further asserted that he would have forgotten about the incident the next day. Without any request from the defendant, Jonas Lena then volunteered the knife to the defendant with the blade already opened. The defendant accepted the knife but did not intend to injure anyone. While then being pushed back to the wall by others, the deceased had hold of the defendant's collar with his right hand and was striking the defendant with his left hand. In an effort to protect himself, the defendant then swung the knife about but did not try to stab anyone. During this altercation the deceased lunged or jumped toward the defendant. The defendant was aware that the deceased was cut on the head, but did not think that he was seriously wounded. If he stabbed the deceased in the chest, the defendant asserted that he was not aware of it and did not intend to do so. On discovery of the body, his ex-wife stated that she could still feel a pulse. When the officers first arrived, the defendant was asked who was responsible, and he replied affirmatively because he thought he probably was responsible. He subsequently agreed to interrogation by the prosecuting attorney because the deputy sheriff had stated the prosecutor would go easier on him and at that time told the prosecuting attorney that the deceased had lunged or jumped toward him as previously described.

The defense then rested and no evidence in rebuttal was offered in behalf of the State.

Although set forth under four different headings, this appeal essentially presents but one assignment of error. The defendant asserts that error requiring reversal, or at least modification, occurred when the State elicited testimony establishing the details surrounding a separate and unrelated offense. Witnesses for the State established that after the first altercation the defendant remarked that he would do the same to the deceased that he had also done to Skipper Roberts, the defendant's cousin.

However, the trial court would not permit these witnesses to testify as to what the defendant previously did to Skipper Roberts, either upon the grounds that the witnesses did not have actual knowledge thereof and their testimony would be hearsay, or because such evidence would tend to establish the commission of another offense. (Tr. 130, 153–157, 180 and 212–214). In direct examination the defendant admitted a prior conviction for Assault and Battery, and over objection was then cross-examined by the State as follows:

"Q. Mr. Lowe, about this previous crime you said you had been convicted of. You testified it was Assault and Battery?

A. Sir?

Q. Did you testify you had been convicted of the crime of Assault and Battery?

A. Yes.

Q. When in truth wasn't it Aggravated Assault and Battery?

A. I don't know the difference.

Q. Wasn't that Aggravated Assault and Battery reduced from a felony?

\* \* \* \* \* \*

A. Yes, it was.

Q. Was that felony charge a cutting affair?

\* \* \* \* \* \*

A. What was the question again?

Q. And was that an original charge where you plead guilty to a crime, did this involve a cutting?

A. Yes.

Q. Was there a man named Skipper the victim in that crime?

A. Yes, he was.

Q. Are you any relation to him?

A. Yes.

Q. What?

A. Cousin." (Tr. 273–276)

Among other cases, the defendant cites *Little v. State*, 79 Okl.Cr. 285, 154 P.2d 772

(1945), wherein we stated in paragraph Six of the Syllabus:

> "While County Attorney may interrogate defendant concerning other convictions for crime for the purpose of affecting his credibility, the trial court should not allow the examination to be enlarged by asking the details of the crime in which conviction was sustained, as such examination might cause jury to place undue emphasis on former conviction of accused and thus cause them to convict mainly because of bad reputation of the accused."

■ A distinguishing feature, however, exists here. Proof of the circumstances surrounding the prior conviction was not admitted until the defendant testified in direct examination that he did not knowingly and intentionally stab the deceased. The declaration by the defendant just before the fatal altercation that he would do to the deceased what he had done to Skipper Roberts was proof of the defendant's state of mind at the time of the alleged offense, but was without significant meaning until the identity of the victim of the prior offense and the nature of that assault was established in cross-examination. At least apart from the testimony that the previous charge was reduced from a felony, the details surrounding that conviction therefore served to impeach the defendant's testimony in direct examination, and established rebuttal proof of intent and the absence of mistake or accident. This was evidence directly refuting the material issue of good faith interjected by the defendant, and not rebuttal proof of a collateral issue. To that extent we are of the opinion that this was proper and legitimate cross-examination.

In *Rambo v. State*, 13 Okl.Cr. 119, 162 P. 449 (1917), involving a prosecution for Possession of Intoxicating Liquor with Intent to Dispose Thereof, this Court, speaking through Judge Rutherford Brett, stated:

> "It also appears that some time prior to the trial of this case Billy Rambo had been intercepted on the highway by an officer by the name of L. P. McGuire with two wagonloads of whisky, consisting of 48 five-gallon kegs. In the trial of this case the defendant John Rambo took the witness stand in his own behalf, and on direct examination denied that he knew Billy was handling whisky, and stated that he had no knowledge of any whisky having ever been on his premises, except the three quart bottles Billy was taking from the house at the time the officers appeared to make the search.
>
> On cross-examination the county attorney asked him if he was not with Billy Rambo and driving one of the wagons at the time he was intercepted by L. P. McGuire with the 48 kegs of whisky, and if the two wagons and teams used to haul this whisky did not belong to him. An objection to these questions was overruled by the court, and the defendant insists that this ruling of the court was error. But the defendant himself laid the foundation for this line of questions. To say that he could go on the stand and testify that he knew nothing about any whisky except the 3 bottles, and that the state could not then on cross-examination ask him about other transactions which would tend to contradict that statement, is absurd. The questions were both pertinent and proper, and clearly legitimate cross-examination."

Also, *Janeway v. State*, 62 Okl.Cr. 264, 71 P.2d 130 (1937), involved a murder prosecution wherein defendant testified that deceased had attempted to force him to rob a bank, but that he had refused on the ground that he had reformed. This Court held that the State was entitled, on cross-examination, to question defendant concerning his alleged participation in a bank robbery subsequent to the killing of deceased. The Court there reasoned, in part, as follows:

> ". . . Certainly, the defendant should not be permitted to put his good faith in issue and receive the benefit of it before

the jury, and then the State be denied the right to cross-examine him and show by this cross-examination that he had made no effort to . . . [reform], but, on the other hand, had been charged with the commission of another offense. The rule that a defendant is to be tried for the offense for which he stands charged, and that evidence of other crimes may not be given, must be considered with the equally well-settled rule that when a defendant takes the witness stand in his own behalf, and on direct examination puts in issue the question of his good faith, then the State, on cross-examination, shall have the right to examine the defendant with reference thereto. Evidence material to the issues involved in the case on trial is not rendered incompetent merely because it may tend to prove the defendant guilty of another offense. . . ." (71 P.2d 135)

■ During presentation of the State's case-in-chief, the defendant also argues that prejudicial error resulted when the prosecuting attorney sought to elicit testimony as to what the defendant had previously done to Skipper Roberts, and cites cases wherein otherwise inadmissible evidence was effectively brought to the attention of the jury through misconduct on the part of the prosecutor. However, as previously observed, the trial court did not permit any such evidence to be admitted until cross-examination of the defendant, and in the examination of his witnesses, the prosecutor here did not by innuendo, or otherwise, attempt to affirmatively assert what the defendant had actually done to Skipper Roberts. The cases cited in support of this argument are, therefore, not in point.

■ While cross-examination of the defendant regarding reduction of the previous charge may have been improper, we conclude that there is no reason to believe that on a second trial an intelligent and honest jury could, or reasonably would, arrive at any other verdict than that of guilty, in view of the clear sufficiency of the evidence to support the verdict finding the defendant guilty of Manslaughter in the First Degree. We therefore conclude that any error in this regard was harmless. See 20 O.S.1971, § 3001 and *Thacker v. State*, 55 Okl.Cr. 161, 26 P.2d 770 (1933). Under the facts and circumstances of this particular case, we further conclude that the jury did not demonstrate prejudice in assessing a sentence of ten (10) years' imprisonment upon the lesser included offense, nor can we declare that sentence to be so excessive as to shock the conscience of the Court. See *LaRue v. State*, Okl.Cr., 404 P.2d 73 (1965).

■ Interlaced in defendant's assignments of error is the contention that the trial court erred in permitting the prosecutor to comment on the meaning of reasonable doubt during voir dire. However, the transcript of proceedings upon voir dire examination was not made a part of the record submitted herein, and no argument or authority was presented in support thereof. This assignment is, therefore, not properly before this Court. See, *Moulton v. State*, Okl.Cr., 476 P.2d 366 (1970) and *Sandefur v. State*, Okl.Cr., 461 P.2d 954 (1969).

■ In passing, we observe that the judgment and sentence herein incorrectly states the crime of which the defendant was convicted to be "Murder—Second Degree," whereas the Verdict and transcript of proceedings upon judgment and sentencing establish the conviction and sentence to be for "Manslaughter in the First Degree." We are therefore of the opinion that the trial court should be directed to enter its Order Nunc Pro Tunc correcting that scrivener's error. See *Flowers v. Page*, Okl.Cr., 434 P.2d 497 (1967).

In conclusion, we observe that the record is free of any error which would justify modification or reversal. The judgment and sentence is accordingly affirmed, with directions that the trial court enter its Order Nunc Pro Tunc correcting the same to reflect that the defendant was convicted

and sentenced for the offense of "Manslaughter in the First Degree," and transmit a copy of the judgment and sentence, so corrected, to the Department of Corrections, the Warden of the State Penitentiary, the Pardon and Parole Board, and the Clerk file the original in Okmulgee County District Court Case No. CRF– 73–116.

BRETT, P. J., and BLISS, J., concur.